STATE of Utah, Plaintiff and Respondent,

v.

Ronnie Lee CRIPPS, Defendant and Appellant.

No. 19140.

Supreme Court of Utah.

Oct. 26, 1984.

John O'Connell, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Randy A. Hudson, County Atty., Salt Lake City, for plaintiff and respondent.

DURHAM, Justice:

Defendant appeals his conviction of distribution of a controlled substance (marijuana) in violation of U.C.A., 1953, § 58–

14. *Id.* at 725.

15. *Powers v. Industrial Comm'n,* 19 Utah 2d 140, 143–44, 427 P.2d 740, 743 (1967).

37–8(1)(a)(ii). The only issue is whether the trial court erred in its instruction to the jury on entrapment. We reverse and remand for a new trial.

On June 19, 1984, three undercover narcotics agents, including agent Ed Spann, became acquainted with Mike Pilling, the defendant's roommate, at the Comic Book Lounge in Helper, Utah. Pilling invited the agents to a party at his and the defendant's home following the close of the tavern that evening. Spann testified that there were approximately thirty people at the party, but he did not notice anyone smoking marijuana nor was he able to find anyone from whom to purchase marijuana, cocaine, or LSD.

Spann closely resembled the defendant in appearance and was introduced as defendant's brother. Photographs of Spann and the defendant embracing each other at the party were produced at trial. The agents told the defendant and others that they were tool runners for oil rigs, that they drove trucks around to all the rigs, and that they knew a lot of people in the drill rigs. Defendant was a truck driver recently laid off from his employment. Spann testified that the defendant asked if Spann could get him a job in the oil fields, but Spann denied that he promised to get defendant a job. Spann asked defendant if he could get some marijuana. Defendant was "very drunk," but he agreed to try to obtain marijuana for Spann.

Spann returned to the defendant's home the following day. Defendant testified that he was home and that he again told Spann he had not found any marijuana to sell to him, but he would "find him something." Spann testified that no one was home. Defendant testified that Spann returned to his home again a few days later to ask defendant if he had found any marijuana, but defendant had not. Spann de-

nied making this contact with defendant.[1] Defendant also testified that Spann offered to help the defendant find a job in the oil fields on the same occasions he was requesting that defendant find some marijuana for him to buy.[2]

The defendant testified that he obtained some marijuana and a scale from a friend. He did not know how much Spann wanted. On July 1 at about 2:00 p.m. Spann arrived at defendant's home with two other agents. The defendant invited the three undercover agents into his home to smoke marijuana. They smoked two joints among them, the agents simulating their participation. Defendant then (at 2:23 p.m.) sold Spann what defendant believed to be an ounce, but what was actually 1.43 ounces of marijuana for $50. An arrest warrant for defendant was issued five months later on December 4, 1981.

The affirmative defense of entrapment is defined by statute as follows:

> Entrapment occurs when a law enforcement officer or person directed by or acting in co-operation with the officer induces the commission of an offense in order to obtain evidence of the commission for the prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

U.C.A., 1953, § 76–2–303(1).

This Court has approved giving the statutory definition of entrapment to the jury. *State v. Salmon*, Utah, 612 P.2d 366, 369 (1980). The defendant requested that the jury be so instructed in this case. However, the trial court, in addition to reciting the statutory definition, added the following paragraph:

> conversation because they used "big words about equipment and stuff" that she did not understand. She was, however, certain that Spann was not offering to help the defendant find a job.

---

**1.** The undercover agents involved testified that they did not keep records regarding contacts made prior to the sale.

**2.** Agent Patricia Hall, present at the sale, testified that Spann and the defendant were talking about oil rigs, but she could not understand the

In assessing the police conduct under the defense of entrapment, the test to determine an unlawful entrapment is whether a law enforcement official or an agent, in order to obtain evidence of the commission of an offense, induced the Defendant to commit such offense by persuasion or inducement which would be effective to presuade [sic] an average person, other than one who was merely given the opportunity to commit the offense.

Defendant contends that the addition of the foregoing paragraph to the jury instruction on entrapment constituted prejudicial error because it substantially raised the standard for unlawful entrapment above that defined by statute and this Court. In particular, defendant points out: the statutory definition requires police conduct that creates a *substantial risk* that the offense will be committed while the jury instruction requires police conduct that *would be effective* to induce the commission of the offense; and second, the statute requires conduct that might induce *one not otherwise ready* to commit the offense, while the jury instruction requires conduct that would induce an *average person* to commit the offense. Moreover, in the present case, the prosecutor, in argument to the jury, emphasized the "average person" phrase, equating it with "ordinary citizen," asking the jury members whether there was conduct that would induce an "ordinary citizen" to obtain marijuana to sell to the agent.

The State correctly points out that the "average person" paragraph originated in *State v. Taylor*, Utah, 599 P.2d 496, 503 (1979), as part of a discussion of the objective test for determining whether a defendant has been entrapped. In *Taylor*, this Court adopted the objective test under which the focus is directed toward the conduct of the government. In contrast, the subjective test focuses on the defendant's predisposition to commit the offense. The goal in adopting an objective theory of entrapment is to eliminate the opportunity for the prosecution to present proof of the accused's criminal character or disposition by evidence of his past offenses.

In elaborating on the objective test, this Court, in *Taylor*, obviously used the phrase "average person" to emphasize the necessity of focusing on the nature of the police conduct in any given case. The phrase was not used in the opinion as a standard against which a defendant could be evaluated to determine if he were entrapped, as in: "Would an *average person* obtain marijuana to sell under these circumstances?" The very facts of *Taylor* and subsequent entrapment cases belie an intention to adopt such a standard. *State v. Sprague*, Utah, 680 P.2d 404 (1984); *State v. Kourbelas*, Utah, 621 P.2d 1238 (1980).

■ In *Taylor* the defense of entrapment was available to a defendant on a charge of distributing a controlled substance for value where, prior to the defense, the undercover agent and the defendant lived together prior to the offense and were heroin addicts who procured and injected their drugs in a context of personal intimacy. After they separated, they remained close friends. The female, who had meanwhile become an undercover government agent, called the defendant and pleaded for drugs for her own use. Defendant had recently undergone detoxification and had personally experienced the agonies of withdrawal, and was therefore able to empathize with a girl he loved. *Taylor*, 599 P.2d at 503. At trial, defendant was not measured against an "average person" standard, and we said on appeal that "[e]xtreme pleas of desperate illness or appeals based primarily on sympathy, pity, or close personal friendship, or offers of inordinate sums of money, are examples, *depending on an evaluation of the circumstances in each case*, of what might constitute prohibited police conduct." *Id.* (emphasis added). Realistically, an average person or ordinary citizen is not a former drug addict, will not be begged by a former lover to obtain drugs, does not have any notion of how to reach people who sell drugs, would probably not befriend the sort of stranger who turns out to be an

undercover narcotics agent, and could not imagine circumstances short of physical threats that would prompt him to obtain marijuana to sell. Unquestionably, the circumstances of each defendant should be considered in relation to the police conduct. Justice Frankfurter's concurring opinion in *Sherman v. United States*, 356 U.S. 369, 384–85, 78 S.Ct. 819, 827, 2 L.Ed.2d 848 (1958), the seminal statement on the objective test of entrapment, supports this view: "Evidence of the setting in which the inducement took place is of course highly relevant in judging its likely effect ...."

Defendant also argues that the "average person" paragraph is simply dictum and should not be elevated to law by being recited in a jury instruction. We agree, particularly where there is a risk that it will mislead the jury or change the legal standard as in the present case. The paragraph is actually taken from an Alaska case, *Grossman v. State*, Alaska, 457 P.2d 226 (1969). The full context is:

> The objective test can be stated as follows: unlawful entrapment occurs when a public law enforcement official, or a person working in cooperation with him, in order to obtain evidence of the commission of an offense, induces another person to commit such an offense by persuasion or inducement which would be effective to persuade an average person, other than one who is ready and willing, to commit such an offense. *Conversely, instigations which would induce only a person engaged in an habitual course of unlawful conduct for gain or profit do not constitute entrapment.*

*Id.* at 229 (footnote omitted; emphasis added). A reading of the entire section of the Alaska opinion reveals that the converse of the conduct which would "persuade an average person" is conduct which would induce only a person engaged in a habitual course of unlawful conduct for gain ˙or profit. Thus, under the Alaska court's rea-

soning, an average person is one who is not regularly engaged in selling narcotics.

■ Moreover, the Alaska court, in *Grossman*, and this Court, in *Taylor*, relied heavily on the concurring opinion of Justice Frankfurter in *Sherman v. United States*, 356 U.S. at 378, 78 S.Ct. at 823. There the objective test for entrapment was articulated as follows:

> The crucial question, not easy of answer, to which the court must direct itself is whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power.

*Id.* at 382, 78 S.Ct. at 825. Indeed, in elaborating on the police conduct aspect of entrapment, Justice Frankfurter said:

> This test shifts attention from the record and predisposition of the particular defendant to the conduct of the police and the likelihood, objectively considered, that it would entrap only those ready and willing to commit crime.

*Id.* at 384, 78 S.Ct. at 826. Therefore, only police conduct that "entraps" those ready and willing to commit the crime is acceptable.

■ The State argues that jury instructions are not to be considered in isolation but as a whole, *State v. Ruben*, Utah, 663 P.2d 445, 449–50 (1983), and that the second paragraph of the jury instruction merely explains the objective standard of entrapment. Any benefit gained from the use of the "average person" paragraph is more than offset by the risk that it obscured the proper legal standard in the jurors' minds, particularly where the prosecutor emphasized the reasonableness of the accused person's acts and not that of the conduct of the police.[3]

We reverse and remand for a new trial.

HALL, C.J., HOWE, J., and DEAN E. CONDER, District Judge, concur.

---

**3.** Ironically, by suggesting an "average man" standard, the instruction may encourage a focus on the accused person's disposition, the very focus to be avoided under the objective test.

STEWART, J., concurs in the result.

ZIMMERMAN, J., does not participate herein.